WO

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

Christopher Lohmeier,

               Plaintiff,

v.

Carolyn W. Colvin, Acting Commissioner
of Social Security,

               Defendant.

No. CV-14-02247-TUC-BPV

**ORDER**

      Plaintiff Christopher Lohmeier has filed the instant action seeking review of the final decision of the Commissioner of Social Security pursuant to 42 U.S.C. § 405(g). Pending before the Court are Plaintiff's Opening Brief (Doc. 17), Defendant's Brief (Doc. 19), and Plaintiff's Reply (Doc. 20).

      The Magistrate Judge has jurisdiction over this matter pursuant to the parties' consent.  (Doc. 24).  For the following reasons, the Court remands the matter for further proceedings.

## I.   PROCEDURAL BACKGROUND

      Plaintiff filed applications, with a protective filing date of September 27, 2012, for disability benefits and supplemental security income under the Social Security Act. (Doc. 17, p. 1; Transcript/Administrative Record (Doc. 15) ("Tr.") 20, 216-226).

Plaintiff alleges that he has been unable to work since October 3, 2012[1], due to "Major depressive disorder, anxiety, mood disorder"; hepatitis C; carpel tunnel syndrome; substance abuse disorder; anti-social disorder; oppositional defiance disorder; and compressed discs in his lower back. (Tr. 302). After Plaintiff's applications were denied initially and upon reconsideration, he requested a hearing before an Administrative Law Judge ("ALJ"). (Doc. 17, pp. 1-2). On January 21, 2014, the matter came on for hearing before ALJ Larry E. Johnson, where Plaintiff, who was represented by counsel, and Vocational Expert ("VE") Kathleen McAlpine testified. (Tr. 37-61). On March 28, 2014, the ALJ issued an unfavorable decision. (Tr. 20-31). The Appeals Council subsequently denied Plaintiff's request for review, thereby rendering the ALJ's March 28, 2014 decision the final decision of the Commissioner. (Tr. 1-6). Plaintiff then initiated the instant action.

## II.   PLAINTIFF'S BACKGROUND

Plaintiff was born in December 1971. (Tr. 216). He quit high school after the ninth grade and has a GED. (Tr. 42, 55, 367). In the past, Plaintiff worked as an electrician's helper. (Tr. 40-41). Plaintiff is divorced and has a fiancée. (Tr. 42, 56). Other than his fiancée, Plaintiff has no friends and he is not in touch with his children or other family: "I don't know why it is, I just…shut down." (Tr. 50). In the past, Plaintiff has been homeless and lived under a bridge. (Tr. 42-43). Plaintiff's fiancée pays for his room and board. (Tr. 43; *see also* Tr. 56 (Plaintiff and his fiancée do not live together); Tr. 664 (Plaintiff lives in transitional housing)).

The record reflects Plaintiff's long history of substance abuse and treatment for mental health issues. Plaintiff's parents separated when he was eight years of age and his father sent him and his siblings to Minnesota when he was eleven "to get rid of us." (Tr. 367). Plaintiff was molested by an older brother and sister when he was between five and ten years old. (Tr. 367; *see also* Tr. 54 (Plaintiff testified he was molested by his

---

[1] Plaintiff initially indicated a disability onset date of July 15, 2005, however, he later amended his alleged disability onset date to October 3, 2012. (*See* Tr. 20, 39-40, 216, 223).

brothers)).

Plaintiff started using drugs at around age eleven.  (Tr. 54; *see also* Tr. 367 (Plaintiff "[s]tarted using THS and alcohol at age thirteen….")).  His drug use "gradually increased w/ cocaine including IVDU of cocaine and heroin."  (Tr. 367 (Plaintiff started using heroin at age 22); *see also* Tr. 403 (Plaintiff reporting having "an addictive personality and [that he] has been addicted to many different types of drugs throughout his lifetime with the most recent being heroin, cocaine, and alcohol")).

The record reflects Plaintiff's report that his depression began when he was twelve years of age and he started to lose interest in things.  (Tr. 367).  Plaintiff also testified that he has had trust issues as long as he can remember:

> I don't know how to say it, except for I just don't like people.  I don't trust people.  I mean, I think that's my biggest issue is trust.  And I've gone to therapy for that a very long time, a very long time, both private paid years and years ago, as well as through La Frontera.  I mean, I would give my right leg to be what they call normal, but I'm just not.

(Tr. 51-52; *see also* Tr. 54).

Plaintiff testified that he is unable to function in the workplace because he "shut[s] down[]" and he does not "do well around people….I get very quiet….I just withdraw." (Tr. 49-50; *see also* Tr. 50 (Plaintiff described shutting down as being "just blah.  I just don't feel anything.")).  His "biggest problem lies…in making it…" to work on a regular basis.  (Tr. 50).  When he found work, he "could do okay for two or three weeks, maybe four or five if I was lucky, and then I would shut down, and then there went another job, and then I would do it over again.  And then there went another job, and then I would lose my place to live, and then I would be out on the street, and then I'd start using again,…."  (Tr. 50-51; *see also* TR. 55 (Plaintiff would be fired from work because of his absences and "[S]ometimes, you know, when I was there I wasn't there."); Tr. 58).

Plaintiff testified that on some days he does not feel like doing anything and does not shower.  (Tr. 47).  Although he likes to read, he is unable to concentrate on reading because his medication makes him sleepy.  (Tr. 57).  He mostly watches television during the day.  (Tr. 55, 57 (Plaintiff also tried exercising but his wrist prevented him from

continuing to exercise)).

During Plaintiff's testimony at the hearing, the ALJ pointed out that Plaintiff was "bobbing and weaving…", but he was not exhibiting that behavior when the ALJ observed him earlier in the hallway.  (Tr. 49).  Plaintiff responded that he did not take his medications before the hearing because it caused him to "nod[] out and slobber[]."  (*Id.*).  He takes the medications because "I do rock a lot, and I sweat a lot[.]"  (*Id.*; *see also* Tr. 46).  Plaintiff also testified that when he is not taking medication, he is not a "very friendly person.  I'm just really short-fused."  (Tr. 56).

## III.   THE ALJ'S DECISION

### A.   CLAIM EVALUATION

Whether a claimant is disabled is determined pursuant to a five-step sequential process.  See 20 C.F.R. §§404.1520, 416.920.  To establish disability, the claimant must show: (1) he has not performed substantial gainful activity since the alleged disability onset date ("Step One"); (2) he has a severe impairment(s) ("Step Two"); and (3) his impairment(s) meets or equals the listed impairment(s) ("Step Three").  "If the claimant satisfies these three steps, then the claimant is disabled and entitled to benefits.  If the claimant has a severe impairment that does not meet or equal the severity of one of the ailments listed…, the ALJ then proceeds to step four, which requires the ALJ to determine the claimant's residual functioning capacity[2]….After developing the RFC, the ALJ must determine whether the claimant can perform past relevant work.…. If not, then at step five, the government has the burden of showing that the claimant could perform other work existing in significant numbers in the national economy given the claimant's RFC, age, education, and work experience."  *Dominguez*, 808 F.3d at 405 (citations omitted).

### B.   FINDINGS IN PERTINENT PART

The ALJ found that Plaintiff had "the following severe combination of

---

[2] Residual Functional Capacity ("RFC") "is defined as 'the most' the claimant can do, despite any limitations."  *Dominguez v. Colvin*, 808 F.3d 403, 405 (9th Cir. 2015), *as amended* (Feb. 5, 2016) (citation omitted).

impairments: substance abuse disorder, carpal tunnel syndrome, hepatitis C, [and] affective disorder…." (Tr. 23).   The ALJ also found that Plaintiff's impairments, "including the substance use disorders…", met the listings for 12.04 (affective disorders) and 12.09 (substance addiction disorders).  (*Id.*).   However, the ALJ also determined that if Plaintiff stopped substance use, Plaintiff would no longer meet the listings, and, upon consideration of his remaining limitations, he would be able to perform medium work.[3] (Tr. 24-26).  The ALJ went on to find that if Plaintiff stopped substance abuse, he would be precluded from performing past work, but the Medical-Vocational Rules ("GRIDS"), supported the conclusion that there still remained a significant number of jobs in the national economy that Plaintiff could perform.  (Tr. 30).

Therefore, the ALJ concluded that:

> The substance use disorder is a contributing factor material to determination of disability because the claimant would not be disabled if he stopped the substance use (20 CFR 404.1520(g), 404.1535, 416.920(g), and 416.935).   Because the substance use disorder is a contributing factor material to the determination of disability, the claimant has not been disabled within the meaning of the Social Security Act at any time from the alleged onset date through the date of this decision.

(Tr. 31).

## IV.   DISCUSSION

Plaintiff argues that: (1) the ALJ's finding of a material substance abuse disorder was unsupported by the evidence of record; (2) the ALJ did not properly consider the opinions from an examining consultant and nurse practitioner; and (3) the ALJ improperly rejected lay testimony.[4]  Defendant counters that the ALJ properly considered

---

[3] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work."  20 C.F.R. § 404.1567(c). *See also* 20 C.F.R. § 416.967(c).  Elsewhere in his decision, the ALJ stated that "[i]f the claimant stopped the substance use, the claimant would not have the residual functional capacity to perform the full range of medium work.  However, the additional limitations that would remain have little or no effect on the occupational base of unskilled medium work[]", thus resulting in a non-disability finding.  (Tr. 31).

[4] Plaintiff indicated he had attached additional evidence outside the administrative record to his Opening Brief as Exhibit A (Doc. 17, p. 6), however, that material was not submitted to the Court and Defendant subsequently objected to any such submission.

1  the evidence and that his decision was supported by substantial evidence.

2      **A.   STANDARD**

3      The Court has the "power to enter, upon the pleadings and transcript of the record,

4  a judgment affirming, modifying, or reversing the decision of the Commissioner of Social

5  Security, with or without remanding the cause for a rehearing."  42 U.S.C. §405(g).   The

6  factual findings of the Commissioner shall be conclusive so long as they are based upon

7  substantial  evidence  and  there  is  no  legal  error.    42  U.S.C.  §§  405(g),  1383(c)(3);

8  *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008). This Court may "set aside the

9  Commissioner's denial of disability insurance benefits when the ALJ's findings are based

10 on legal error or are not supported by substantial evidence in the record as a whole."

11 *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted).

12     Substantial  evidence  is  "'more  than  a  mere  scintilla[,]  but  not  necessarily  a

13 preponderance.'"  *Tommasetti*, 533 F.3d at 1038 (quoting *Connett v. Barnhart*, 340 F.3d

14 871,  873  (9th  Cir.  2003));  *see also Tackett*,  180  F.3d  at  1098.    Further,  substantial

15 evidence  is  "such  relevant  evidence  as  a  reasonable  mind  might  accept  as  adequate  to

16 support a conclusion."  *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007).  Where "the

17 evidence can support either outcome, the court may not substitute its judgment for that of

18 the ALJ."  *Tackett*, 180 F.3d at 1098 (citing *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th

19 Cir.  1992)).    Moreover, the Commissioner, not the court, is charged with the duty to

20 weigh  the  evidence,  resolve  material  conflicts  in  the  evidence  and  determine  the  case

21 accordingly.  *Matney,* 981 F.2d at 1019. However, the Commissioner's decision "'cannot

22 be affirmed simply by isolating a specific quantum of supporting evidence.'"   *Tackett,*

23 180  F.3d  at  1098  (quoting  *Sousa v. Callahan*, 143  F.3d  1240,  1243  (9th  Cir.1998)).

24 Rather, the Court must "'consider the record as a whole, weighing both evidence that

25

26 (Doc. 19, p. 3 n.1).  In his Reply, Plaintiff  acknowledged that he failed to attach the
evidence which "consisted of further lab results proving Plaintiff's sobriety…contin[ing]
27 through October 2014, but as the ALJ does not question Plaintiff's reports of sobriety,
Plaintiff states no argument to Defendant's objection to a future submission of this
28 evidence to this Court." (Doc. 20, p. 3). Therefore, the submission of additional evidence
is not at issue in this case.

1  supports and evidence that detracts from the [Commissioner's] conclusion.'" *Id.* (*quoting*

2  *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993)).

3      **B.   ANALYSIS**

4         **1.   PRELIMINARY ISSUES**

5      At the outset, Plaintiff bases much of his argument on two assertions that require

6  discussion.  The first addresses Plaintiff's alleged period of abstinence from substance

7  abuse (*see* Doc. 17, p. 11; Doc. 20, p. 7) and the second involves Plaintiff's position that

8  "the Administration's non-examining consultants[] [found] that the Plaintiff's prior

9  substance abuse was not material herein."  (Doc. 20, p. 8; *see also* Doc. 17, p. 11).

10         **a.   PERIOD OF ABSTINENCE FROM SUBSTANCE ABUSE**

11      Plaintiff argues that he had not "abus[ed] drugs for nearly a year prior to his

12  amended alleged onset date of 10/03/12, which was supported by concrete laboratory

13  evidence (clean drug screens) from a licensed facility, for one year leading up to the

14  hearing and further supported by the treating source records and opinion letters." ((Doc.

15  17, p. 10 (citing Tr. 682-91 ("clean" lab tests from October 3, 2012 to May 3, 2013); Tr.

16  701-05 ("clean" lab tests from June 30, 2013 to October 7, 2013); *see also* Doc. 20, p. 7

17  (Plaintiff's "proven sobriety period was of a duration of some seventeen (17) months

18  before the hearing, and more than a year prior to his amended A[lleged] O[nset] D[ate].")

19  (citing Tr. 632)).

20      Approximately one year prior to Plaintiff's amended alleged onset date, treatment

21  records reflect Plaintiff's report to La Frontera staff on October 20, 2011, about a

22  "signif[icant] relapse into heroin use recently d[ue]/t[o] being homeless, inability to find

23  work, not being able to speak with his children d/t losing phone privileges while in CDV.

24  He left CDV…d/t conflicts with staff….Reports he last used heroin 2 days ago."  (Tr.

25  479).  Plaintiff also reported he had recently been incarcerated where he received

26  Thorazine which helped with heroin withdrawal.  (*Id.* (Thorazine had also been

27  prescribed because Plaintiff had been hearing voices)).  At this time, Plaintiff was

28  diagnosed with anxiety disorder, nos; major depressive disorder, recurrent; opiod type

1  dependence, continuous; and cocaine dependence, continuous (*Id.*).  He was prescribed
2  Celexa, Chlorpromazine, and Benadryl.  (Tr. 480).  By November 14, 2011, Plaintiff
3  expressed his desire to stop using drugs. (Tr. 541)  Although he experienced  improved
4  sleep, up to eight hours a day, with a use of a sleep aid  (*Id.*), he also requested to switch
5  from Celexa to Prozac because Celexa made him feel anxious and nervous. (Tr. 481).  At
6  this time he presented as euthymic, with fair judgement and insight, and "ok" thought
7  processes.  (*Id.*).

8       In December 2011, Plaintiff and a friend presented for family counseling "to assist
9  [Plaintiff]…in identifying what patterns lead [sic] to relapse in the past." (Tr. 554).
10  Plaintiff's friend "reported client will gain sobriety but will then have the pressure of
11  paying bills when living with others which eventually leads to relapse."  (*Id.* (at this time
12  Plaintiff was living at New Directions)).   Also in December 2011, Plaintiff stated he
13  discontinued Thorazine, which he had been taking to help him sleep, because it made him
14  "feel drowsy all day."  (Tr. 483).   He reported increased depression.  (*Id.*).   On
15  examination, he appeared euthymic, with "ok" affect, thought content and speech.  (*Id.*).
16  His judgement and insight were fair.  (*Id.*).   There was no evidence of drug or alcohol
17  use.  (Tr. 484).

18       By February 2012, Plaintiff's sister reported to La Fonterra staff that he had stolen
19  her husband's car and been arrested for an extreme DUI.  (Tr. 521).  Plaintiff was unable
20  to identify the reason for his relapse.  (Tr. 523 ("Coordinator…explained to client that
21  relapse is a part of the cycle of recovery."); *see also* Tr. 615 (Plaintiff's February 2012
22  report that "he recently relapsed into drug use.")).   Upon Plaintiff's report of being
23  depressed and anxious, his Prozac dosage was increased.  (Tr. 615).  His examination was
24  normal.  (*Id.*).

25       In March 2012, Plaintiff reported
26           no substance abuse for the last 3 weeks, is working about 15 hours a week
             and is looking to start working more often with church, and continues to
27           attend all court dates which displays increase in functioning.  Client also
             reports depressive symptoms are minimal, experiencing them about 1-2
28           times a week.  Client also reported being able to sleep 8 hours a night but is

taking Benadryl nightly to assist in this.

(Tr. 532).

However, on June 28, 2012, Plaintiff reported that he used heroin the day before. (Tr. 619). Nurse Practitioner Priscilla Tellis' treatment note also reflects: "Also abusing cocaine and MJ. Last drank alcohol 06/19/2012…Unemployed. Lives at Primavera. Appetite, sleep, energy poor." (*Id.*). He presented as euthymic with "ok" affect, thought content, speech, judgement and insight. (*Id.*). He also exhibited mild to moderate withdrawal symptoms. (*Id.*). NP Tellis also stated that: "No evidence of drugs and/or alcohol use." (*Id.*).

A mental status examination performed in August 2012 by Linda Banziger,[5] FPMHNP, at La Frontera, reflected that Plaintiff presented with poor eye contact, speech that was increased in rate and somewhat forceful, and a reserved affect. (Tr. 623). His thought processes were rapid, circumstantial and logical. (*Id.*). His insight and judgement were fair. (*Id.*). NP Banziger also noted Plaintiff's "long term history of polysubstance abuse with multiple relapses." (*Id.*). Plaintiff reported during the examination that he experienced mood swings and "[s]ometimes he feels optimistic and he can do anything and then he shuts down and won't take a shower or eat." (*Id.*). He also reported depression, anxiety, hypersexuality and that his concentration and focus were not good. (*Id.*). Bipolar mood disorder was added to Plaintiff's diagnoses, which included anxiety disorder, opioid type dependence continuous, and cocaine dependence continuous. (Tr. 624, 677). Plaintiff was prescribed Risperidone. (Tr. 624). At this time, Plaintiff was living in a sober living house. (TR. 678).

In September 2012, Plaintiff reported to NP Banziger that he "continue[d] to struggle with anxiety and not wanting to be around people. He finds if he is able to go to work, he gets 'out of self' and that is helpful." (Tr. 676). On mental status examination, Plaintiff presented with intermittent eye contact, depressed and anxious mood, monotone

---

[5] NP Banziger's name also appears spelled as "Banzinger". (*See, e.g.,* Tr. 672). For consistency, the Court refers to her as NP Banziger.

slowed speech, linear and logical thought processes, and good insight and judgement. (*Id.*).  NP Banziger's impression was that Plaintiff experienced "persistent difficulty with anxiety and depression."  (*Id.*).  She increased lamotrigine and added gabapentin for anxiety.  (*Id.*).[6]

On October 18, 2012, soon after Plaintiff's amended alleged onset date, Plaintiff reported "things are not good; not sleeping well and really depressed. Cynical again – expects the worse….Has a feeling that people don't have good intentions towards him." (Tr. 674).  He exhibited good eye contact but he verbalized rapidly and his affect was restricted.  (*Id.*).  His mood was irritable and depressed and his speech was monotone but at a normal rate.  (*Id.*).  His thought processes were logical, linear and goal directed and his insight was intact and judgement fair.  (*Id.*).  NP Banziger increased gabapentin and lamotrigine and continued him on hydroxyxine.  (*Id.*).

On November 18, 2012, Plaintiff reported waking up three to four times a night, which left him tired throughout the day.  (Tr. 672).  He experienced racing thoughts, increased paranoia and was fighting a lot with his girlfriend.  (*Id.*).  NP Banziger discontinued gabapentin, noting that the drug has been found to increase paranoia.  (*Id.*). She added Seroquel and continued Plaintiff on hydroxyzine pamoate and lamotrigine. (Tr. 671-72).  She also noted that Plaintiff continued on methadone maintenance and he had been "[c]lean for seventy days."  (Tr. 672).

In December 2012, Plaintiff reported that he still was not sleeping well, but he was working out, doing 500 pushups a day, which made him feel better.  (Tr. 670).  He exhibited good eye contact, restricted affect, increased rate of speech, and euthymic mood.  (*Id.*).  His thought processes were linear and logical and his insight was intact with good judgement.  (*Id.*).  NP Banziger found an "[o]verall showing improvement

---

[6] Along with methadone treatment, Plaintiff underwent laboratory testing beginning in September 2012.  (*See* Tr. 683 (October 3, 2012 results for collection taken on September 25, 2012)).   The record contains laboratory test results reflecting that Plaintiff was drug free from the October 3, 2012 result, which is the same date as Plaintiff's amended alleged onset date, through at least October 7, 2013 (Tr. 683-91, 701-05; *see also* Doc. 20, p. 7 n.1).

1  with current medications [hydroxyzine pamoate, lamotrigine, Seroquel, and methadone].

2  Self initiation of exercise program."  (Tr. 669-70).

3      In February 2013, Plaintiff reported impaired sleep and unstable moods.  (Tr. 664).

4  NP Tellis adjusted Plaintiff's dosages of hydroxyzine pamoate and Seroquel to address

5  this.  (*Id.*).  He presented with euthymic mood, appropriate affect, thought processes

6  within normal limits and "ok" attention, thought content, speech, insight and judgement.

7  (*Id.*).  Plaintiff was living at "5 Points Transitional Housing facility."  (*Id.*).  There was no

8  evidence of drug or alcohol use.  (*Id.*).

9      In March, 2013, Plaintiff reported to NP Tellis that he was "stable and doing well

10  on current meds.  Denies adverse effects and wants to continue taking them….Appetite,

11  sleep, energy ok."  (Tr. 662).  His mental status exam was normal.  (*Id.*).

12      Plaintiff asserts that he was drug free "for nearly a year prior to his amended

13  alleged onset date of 10/03/12….", (Doc. 17, p. 10).  The record speaks for itself as to the

14  documented instances of Plaintiff's substance abuse during the year prior to his amended

15  alleged onset date.  The record supports Plaintiff's assertion that he "abstained from

16  illicit drug use for the entire time from his amended A[lleged] O[nset] D[ate] until the

17  ALJ's determination."  (Doc. 17, p. 11; *see also* Tr. 24, 683-91, 701-05).

18      **b.**    SERIOUSLY MENTALLY ILL ("SMI") DETERMINATION

19      Plaintiff also asserts that the ALJ's findings conflicted with "the Administration's

20  non examining consultants' findings that the Plaintiff's prior substance abuse was not

21  material herein."  (Doc. 20, p. 8 (citing Tr. 632); *see also* Doc. 17, p. 11 (citing Tr. 632)).

22  The document cited by Plaintiff is a Referral for SMI Determination signed in 2010 by

23  Reviewer Nurse Practitioner Ellen M. McVay, Jane Crawford Recovery Facilitator, BA,

24  and Dawn Norton, Clinical Supervisor, MC, NCC, LPC.  (Tr. 631-35; *see also* (Tr. 636

25  (SMI eligibility determination signed by NP McVay on May 3, 2010)).  The document

26  reflects that the "qualifying SMI diagnosis" includes: major depressive disorder,

27  recurrent, severe; and mood disorder, not otherwise specified.  (Tr. 631).  That same page

28  contains the question whether the deficits are caused by substance abuse, and "N" was

indicated as the answer. (*Id.*) Page 632, the page cited by Plaintiff, indicates he has: been homeless for the past seven years; held 25-30 jobs over the past two years; significant impairment in interpersonal relationships including that he is not allowed to see his children; periods of extreme activity and periods where he cannot get out of bed; and that he is a danger toward self or others because he had been to prison for selling drugs and multiple drug charges. (Tr. 632).

"[T]he ultimate responsibility for determining whether an individual is disabled under Social Security law rests with the Commissioner…." Social Security Ruling ("SSR") 06-03p, 2006 WL 2329939, *7. Disability determinations by other governmental and non-governmental agencies are not binding on the Commissioner. *Id.; see also* 20 CFR §§ 404.1504, 416.904. This rule applies even where the standards for obtaining disability benefits through another agency are more rigorous than the standards applied by the Social Security Administration. *Wilson v. Heckler*, 761 F.2d 1383, 1386 (9th Cir. 1985). Therefore, while a state finding of disability can be introduced into evidence in a proceeding for Social Security disability benefits, an ALJ may attribute as much or as little weight to the finding as he or she deems appropriate. 20 C.F.R. §§ 404.1504, 416.904; *see also Bates v. Sullivan,* 894 F.2d 1059, 1063 (9th Cir. 1990), *overruled on other grounds by Bunnel v. Sullivan,* 947 F.2d 341 (9th Cir. 1991); *Little v. Richardson*, 471 F.2d 715, 716 (9th Cir.1972) (state determination of disability was not binding in proceedings on application for Social Security disability benefits). *Cf.,* SSR 06-03p, 2006 WL 2329939, *7 (Although such a determination is not binding, "the adjudicator should explain the consideration given to these decisions in the notice of decision for hearing cases and in the case record for initial and reconsideration cases.").

Contrary to Plaintiff's assertion, there is no support for the conclusion that the 2010 SMI determination was rendered in conjunction with Plaintiff's current applications for disability benefits at issue here. In addressing the SMI determination, the ALJ acknowledged that when the determination was made, Plaintiff

> was assigned a GAF of 53 while reporting a history of being clean and
> sober from illicit substances. [Tr. 634] The undersigned notes that the

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> treatment records indicate that many of the claimant's symptoms were the result of his self-report and not generated as a result of psychometric testing.

(TR. 26 (citing Tr. 631)).   At first glance, the ALJ's reason for rejecting the SMI determination arguably conflicts with his earlier finding that Plaintiff is credible concerning the symptoms and limitations he alleged in 2010 as cited in the SMI paperwork.   (Tr. 24 (citing 634-36 (SMI paperwork)).   However, the ALJ went on to explain that:

> It appears from the record that, until 2012, the claimant had a history of substance abuse, intermittent sobriety and relapses.   Until the claimant began methadone treatment and blood testing it appears to the undersigned that the therapists at La Frontera based their assessments as to whether the claimant was sober or not entirely on the claimant's self-report.   As such, the undersigned finds that it is difficult, if not impossible to separate the claimant's alleged mental impairments from the effects caused by his substance abuse.

(Tr. 24).

It follows from the ALJ's discussion that he questioned the basis on which it was determined that Plaintiff's deficits resulting in the SMI determination were not caused by substance abuse.   Although the SMI paperwork completed in the spring of 2010 reflects Plaintiff "has been clean for the past 1.5 years" (TR. 634), a February 2010 La Frontera progress note reflected Plaintiff's report that he "has been clean since 2008 but has relapsed w[ith] the last time being in Nov. 2009."   (Tr. 367; *see also* Doc. 17, p. 2).   Furthermore, as discussed above, an SMI determination does not automatically equate to a finding that the claimant is disabled under the Social Security Act.   Nor is there any showing on the instant record that the 2010 SMI determination translates to any specific limitations regarding Plaintiff's abilities to perform work related activity during the period at issue here.

## 2.   SUBSTANCE ABUSE AND ADDICTION

A person is not considered disabled "if alcoholism or drug addiction would...be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U .S.C.§423(d)(2)(C). In determining whether a claimant's alcoholism or

drug addiction is material under 42 U.S.C. § 423(d)(2)(C), the test is whether an individual would still be found disabled if he or she stopped using alcohol or drugs. *See* 20 C.F .R. §§ 404.1535(b), 416.935(b); *Parra,* 481 F.3d at 746-47; *Sousa,* 143 F.3d at 1245.

If the ALJ finds a claimant disabled after applying the five-step sequential evaluation process, *see* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4), and there is medical evidence of drug addiction or alcoholism ("DAA"), the ALJ must determine whether the DAA is a contributing factor material to the determination of disability. *See* SSR 13-2p, 2013 WL 621536, at *2. In order to determine whether the DAA is a contributing factor material to the determination of disability, the ALJ determines whether the claimant's other impairments would improve to the point of nondisability in the absence of the DAA. *Id*. at *7.   In doing so, the ALJ applies the steps of the sequential evaluation a second time to determine whether the claimant would be disabled if he or she were not using drugs or alcohol.  *Id*. at *4.  If the remaining limitations would not be disabling after applying the sequential evaluation a second time, then the DAA is a contributing factor material to the determination of disability and the claim is denied. 20 C.F.R. §§ 404.1535, 416.935; SSR 13-2p, 2013 WL 621536, *4. The ALJ is to make this determination based on the record as a whole.  Plaintiff continues to have the burden of proving disability throughout the DAA analysis. SSR 13–2, 2013 WL 621536, *4; *see also Parra,* 481 F.3d at 744 ("the claimant bears the burden of proving that his substance abuse is not a material contributing factor to his disability.").

Plaintiff argues that the DAA analysis was unwarranted given that he has not used drugs since his amended alleged onset date.  Defendant counters that "the regulations do not limit the ALJ to consideration of only that medical evidence which dates during the adjudicative period; rather, the regulations require an ALJ to consider the entire record when evaluating a claim. 20 C.F.R. §§404.1520(a)(3), 416.920(a)(3)….Thus, the ALJ did not error by considering the entire record, which included significant evidence of substance abuse prior to the amended alleged onset date."  (Doc. 19, p. 5 (record citations

1  omitted)).

2          While both parties concede it was proper for the ALJ to consider evidence prior to

3  the alleged onset date (*see id.*; Doc. 20, p. 7), it is not entirely clear that the ALJ was

4  required to engage in the DAA analysis given the laboratory evidence that Plaintiff had

5  stopped using illicit drugs beginning at least in September 2012, which was the month

6  before his amended alleged onset date.  *Cf.* SSR 13-2p n. 26, 2013 WL 621536, *12 n. 26

7  ("If, however, a claimant is abstinent and remains disabled throughout a continuous

8  period of at least 12 months, DAA is not material even if the claimant's impairment(s) is

9  gradually improving.").  Nonetheless, in light of Plaintiff's long history of drug use with

10  intermittent periods of sobriety and relapse, including the close proximity of his relapse

11  in June 2012 to his amended disability onset date a few months later in October, the

12  ALJ's consideration of the impact of Plaintiff's drug use, if any, on Plaintiff's alleged

13  impairments was reasonable.  Even if the ALJ should not have engaged in a DAA

14  analysis, there is no showing that the error, in and of itself, harmed Plaintiff given that the

15  ALJ went on to apply the sequential evaluation to determine that Plaintiff was not

16  disabled upon discontinuation of substance abuse.  *See Molina v. Astrue,* 674 F.3d 1104,

17  1115 (9th Cir. 2012) (citing *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009)).  "[A]n ALJ's

18  error is harmless where it is []inconsequential to the ultimate nondisability

19  determination.[]…In other words, in each case [the court] look[s] at the record as a whole

20  to determine whether the error alters the outcome of the case." (internal quotation marks

21  and citations omitted).  Plaintiff argues the ALJ erred in failing to determine which of

22  impairments would be severe if he stopped substance abuse.  (Doc. 20, p. 9). However,

23  implicit in the ALJ's opinion is that, in the absence of substance abuse, Plaintiff had the

24  following severe combination of impairments: carpal tunnel syndrome, hepatitis C, and

25  affective disorder.  (*See* Tr. 23; *see also* Tr. 25-26 (discussing whether Plaintiff would

26  meet or equal the Listings for 11.14 (carpel tunnel syndrome) and 12.04 (affective

27  disorder) if he stopped substance use)).[7]  As required by the second part of the DAA

28

───────────────

[7] The Listing of Impairments state that "[t]he structure of the Listing for substance

1    analysis, the ALJ then went on to assess whether Plaintiff was disabled if he stopped

2    substance abuse under the sequential evaluation–a determination that took into account

3    Plaintiff's period of sustained sobriety which is precisely what Plaintiff argues the ALJ

4    should have done.  (*See e.g.,* Doc. 17, p. 11).

5                    **3.    OPINION EVIDENCE**

6            Plaintiff takes issue with the ALJ's treatment of medical opinions from examining

7    Psychologist Glen Marks, Ph.D., and Plaintiff's treating providers at La Frontera.

8            There are three types of medical opinions (treating, examining, and nonexamining)

9    and each type is, generally, accorded different weight. *See Valentine v. Comm'r of Soc.*

10   *Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009); *Lester v. Chater*, 81 F.3d 821, 830-31 (9th

11   Cir. 1995); *see also Carmickle v. Comm'r,* 533 F.3d 1155, 1164 (9th Cir. 2008) ("Those

12   physicians with the most significant clinical relationship with the claimant are generally

13   entitled to more weight than those physicians with lesser relationships.").   Generally,

14   more weight is given to the opinion of a treating source than the opinion of a doctor who

15   did not treat the claimant. *See Turner v. Comm'r of Soc. Admin.*, 613 F.3d 1217,

16   1222 (9th Cir. 2010); *Winans v. Bowen,* 853 F.2d 643, 647 (9th Cir. 1987).   An ALJ may

17   reject a treating physician's uncontradicted opinion only after giving "'clear and

18   convincing reasons' supported by substantial evidence in the record." *Reddick v. Chater*,

19   157 F.3d 715, 725 (9th Cir. 1998) (quoting *Lester*, 81 F.3d at 830).  "Even if the treating

20   doctor's opinion is contradicted by another doctor, the ALJ may not reject this opinion

21   without providing 'specific and legitimate reasons' supported by substantial evidence in

22   the record." *Reddick*, 157 F.3d at 725 (citing *Lester*, 81 F.3d. at 830).

23          "And like the opinion of a treating doctor, the opinion of an examining doctor,

24   even if contradicted by another doctor, can only be rejected for specific and legitimate

25   reasons that are supported by substantial evidence in the record."  *Lester*, 81 F.3d at 830-

26   _____

27   addiction disorders, 12.09, is ... different from that for the other mental disorder listings.
     Listing 12.09 is structured as a reference listing; that is, it will only serve to indicate
     which of the other listed mental or physical impairments must be used to evaluate the
28   behavioral or physical changes resulting from regular use of addictive substances." 20
     C.F.R. § Pt. 404, Subpt. P, App. 1, §12.00(A).

31.   The ALJ can meet this burden "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings. The ALJ must do more than offer his conclusions….He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Orn v. Astrue,* 495 F.3d 625, 632  (9th Cir. 2007) (citations omitted).

### a.   EXAMINING DR. MARKS

Dr. Marks examined Plaintiff in January 2013.  (Tr. 640-45).   His diagnoses included major depressive disorder-moderate-recurrent and bipolar disorder versus mood disorder NOS.  (Tr. 642).  Upon examination, Dr. Marks found, in pertinent part, that Plaintiff

> presented with an anxious mood and blunted affect….Throughout the entire interview, he was crumpling a paper, and there was ongoing psychomotor restlessness.  Speech was unremarkable, and he was able to provide articulate responses to all questions.  Thought processes were linear, logical and goal directed.  He was somewhat vague in describing symptoms, and it appeared that he had difficulty in articulating what he was feeling.
>
> Eye contact was avoidant throughout the entire evaluation.  He did not once make eye contact….Level of insight appeared to be minimally intact.  Intellectual level of functioning appeared to be in the low average-to-average range.
>
> On the Mini Mental Status Exam,…[Plaintiff] scored 27/30.  [He] misidentified the year as 2012. However, he did appear to be completely oriented, and that was likely an error due to recent change in year.  He was able to complete serial sevens, without any difficulty.  He could only recall one out of three words on a delayed recall trial but was able to identify the other two words when given a multiple choice option.  He had difficulty with repetition.  He was able to follow a three-step command, and was able to both generate a sentence and read a simple sentence.

(Tr. 642).  Dr. Marks assigned a Global Assessment of Functioning ("GAF") Score of 50 (Tr. 642), which indicates "[s]erious symptoms…or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."[8] American

---

[8] The Ninth Circuit has explained that:

"A GAF score is a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment." *Vargas v. Lambert,* 159 F.3d 1161, 1164 n. 2 (9th Cir.1998).

1    Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 1994),

2    p. 32.

3    Dr. Marks completed a Psychological/Psychiatric Medical Source Statement

4    wherein he indicated Plaintiff's limitations caused by his mental impairments were

5    expected to last twelve continuous months from the date of the examination.  (Tr. 643).

6    He further indicated that with regard to: (1) understanding and memory, Plaintiff "does

7    demonstrate some difficulty retaining new information.  If he could work, he would

8    likely need to work in a position that required hands on types of learning."; (2) sustained

9    concentration and persistence, Plaintiff "could likely work for short periods of time.  Yet,

10   he would likely need frequent breaks."; (3) social interactions, Plaintiff, "if he were

11   capable of working for an extended period of time, would likely need to be able to work

12   at his own pace without interacting on a continual basis with others."; (4) adapting to

13   change, Plaintiff had sufficient capabilities.  (Tr. 644).

14   The ALJ gave what he termed "appropriate weight" to Dr. Marks' opinion.  (Tr.

15   28).  The ALJ acknowledged that Dr. Marks' examination was performed after Plaintiff

16   "was presumed to be clean and sober from illicit substances."  (Tr. 28-29).  According to

17   the ALJ, Dr. Marks' "noted that the claimant was highly functional, based upon his test

18   results."  (Tr. 29).  The ALJ went on to reject Dr. Marks' assessment that Plaintiff would

19

20   According to the DSM–IV, a GAF score between 41 and 50 describes
     "serious symptoms" or "any serious impairment in social, occupational, or

21   school functioning." A GAF score between 51 to 60 describes "moderate
     symptoms" or any moderate difficulty in social, occupational, or school

22   functioning." Although GAF scores, standing alone, do not control
     determinations of whether a person's mental impairments rise to the level of

23   a disability (or interact with physical impairments to create a disability),
     they may be a useful measurement. We note, however, that GAF scores are

24   typically assessed in controlled, clinical settings that may differ from work
     environments in important respects. *See, e.g., Titles II & XVI: Capability to*

25   *Do Other Work–The [M]edical–Vocational Rules As A Framework for*
     *Evaluating Solely Nonexertional Impairments,* SSR 85–15, 1983–1991 Soc.

26   Sec. Rep. Serv. 343 (S.S.A 1985) ("The mentally impaired may cease to
     function effectively when facing such demands as getting to work

27   regularly, having their performance supervised, and remaining in the
     workplace for a full day.").

28   *Garrison v. Colvin*, 759 F.3d 995, 1002 n.4 (9th Cir. 2014).

be able to work for short periods of time only and would require frequent breaks. (*Id.*). According to the ALJ, these limitations were "not supported by any of his test results and appear to be based, at least in part, on the claimant's self-report or the claimant's history of mental health treatment, as documented in La Frontera records, which do not give adequate weight to the claimant's drug use." (*Id.*).

At the outset, there is nothing in the record to suggest that Dr. Marks disbelieved Plaintiff's description of his symptoms. *See e.g. Regennitter v. Comm'r of Soc. Sec.,* 166 F.3d 1294, 1300 (9th Cir. 1999) (substantial evidence did not support ALJ's finding that examining psychologists took the claimant's "statements at face value" where psychologists' reports did not contain any indication that the claimant was malingering or deceptive); *see also Ryan v. Comm'r of Social Sec.,* 528 F.3d 1194, 1200 (9th Cir. 2008) (same where there was nothing in the record to suggest that examining psychologist disbelieved the claimant's description of her symptoms). Further, although Defendant argues that a discrepancy between a doctor's opinion and his examination findings is a proper basis for rejection, (Doc. 19 *citing Morgan v. Comm'r of Soc. Sec.,* 169 F.3d 595, 601 (9th Cir. 1999)), this case involves no such discrepancy. Rather, the ALJ ignored Dr. Marks' observations noted in his report, that Plaintiff, among other things, presented with an anxious mood, blunted affect, ongoing psychomotor restlessness, avoidant eye contact during the entire evaluation and had difficulty retaining new information. (Tr. 642). The ALJ also failed to acknowledge that testing showed that Plaintiff had difficulty with repetition. (*Id.*). As the Ninth Circuit has pointed out, "'[m]erely to state that a medical opinion is not supported by enough objective findings 'does not achieve the level of specificity our prior cases have required, even when the objective factors are listed seriatim.'" *Rodriguez v. Bowen,* 876 F.2d 759, 762 (9th Cir. 1989) (quoting *Embrey v. Bowen,* 849 F.2d 418, 421 (9th Cir. 1988)). Moreover,

> [c]ourts have recognized that a psychiatric impairment is not as readily amenable to substantiation by objective laboratory testing as is a medical impairment and that consequently, the diagnostic techniques employed in the field of psychiatry may be somewhat less tangible than those in the field of medicine. In general, mental disorders cannot be ascertained and verified

as are most physical illnesses, for the mind cannot be probed by mechanical devices in order to obtain objective clinical manifestations of mental illness.... [W]hen mental illness is the basis of a disability claim, clinical and laboratory data may consist of the diagnoses and observations of professionals trained in the field of psychopathology. The report of a psychiatrist should not be rejected simply because of the relative imprecision of the psychiatric methodology or the absence of substantial documentation, unless there are other reasons to question the diagnostic technique.

*Sanchez v. Apfel,* 85 F.Supp.2d 986, (C.D. Cal. 2000) (quoting *Christensen v. Bowen*, 633 F.Supp. 1214, 1220-21 (N.D.Cal. 1986) (quotation marks and citation omitted).  There is nothing in the record to suggest that Dr. Marks relied more heavily on Plaintiff's self report or records from La Frontera rather than his own clinical observations in assessing Plaintiff's limitations, including that Plaintiff would be able to work for short periods of time only and would require frequent breaks.  *See e.g. Ryan,* 528 F.3d at 1200 (substantial evidence did not support ALJ's finding that examining psychologist's findings relied more heavily on the claimant's self report rather than the doctor's clinical observations).  On this record, the ALJ failed to provide sufficient reasons to reject Dr. Marks' opinion that Plaintiff would be able to work for short periods of time only and would require frequent breaks.

### b. TREATING PROVIDERS

On January 10, 2014, Nurse Practitioner Priscilla Tellis and Dr. Karaumanchi, both of La Frontera, wrote a letter confirming Plaintiff's treatment at La Fonterra since 2010, and stating that Plaintiff met the Listings for affective disorder (12.04), anxiety-related disorders (12.06), and substance addiction disorders (12.09).[9]  (Tr. 744-45). In summarizing Plaintiff's treatment history, they stated out that

[his] symptoms support a qualifying diagnosis of Seriously Mentally Ill (SMI) due to meeting the functional criteria for SMI A, which indicates Mr. Lohmeier is unable to live in an independent living setting and may be at

---

[9] Defendant points out that NP Tellis is not considered a medical source.  (Doc. 19, p. 10 n. 3).  However, "for the sake of simplicity, Defendant treats this source statement as if [sic] were adopted by Dr. Karaumanchi, which makes it subject to the specific and legitimate standard for purposes of rejection."  (*Id.* (citation omitted)).

risk of harm to self or others.  At the onset of treatment with La Frontera, Mr. Lohmeier presented as homeless and unable to maintain employment with significant impairment in personal relationships and unable to maintain personal relationships. He reported periods of extreme activity and sudden onset of periods where he couldn't get out of bed, which was supported by his erratic employment history.  At this time, he endorsed symptoms of mood swings, irritability, insomnia/hypersomnia, feelings of hopelessness, and racing thoughts.  It was determined that Mr. Lohmeier's disabilities were not caused by substance abuse or an underlying medical condition.

***

Mr. Lohmeier has consistently presented with symptoms that support his current diagnoses:  racing thoughts; sense of hopelessness; reported periods of activity with sudden onset of periods of complete mental shut down and isolation; anxiety as evidenced by rocking, fidgeting, and poor eye contact; increased rate of speech and forced speech, and other times monotone and sowed speech; depressed, anxious, or irritable mood, and reported sleep disturbances.  Mr. Lohmeier currently demonstrates a prolonged period of abstinence from alcohol and drug use.  However, although the psychiatric medications that Mr. Lohmeier is currently taking seem to have decreased the frequency of his symptoms, the symptoms that impair his ability to exhibit normal responses to stress (mood swings, irritability, and hopelessness), develop and maintain personal relationships, avoid episodes of decomposition (severe depressive cycles and isolation), and avoid sleep disturbances are persistent.  It is likely that these symptoms will continue indefinitely.

The symptoms Mr. Lohmeier exhibits and the medications[10] he is prescribed significantly decrease his capacity to function in situations that require a consistent routine or schedule, prolonged interaction with others, sustained periods of wakefulness and concentration, stressful environments, or environments requiring mid to high-level problem solving.  I do not believe Mr. Lohmeier is eligible for gainful employment.

(*Id.*).

The ALJ gave "reduced weight" to this opinion.  (Tr. 29).  However, initially, the ALJ apparently agreed in part with the assessment given that he, too, found that Plaintiff met the Listings for 12.04 and 12.09 while engaging in substance abuse. The ALJ's opinion primarily differed from the treating provider assessment when he went on to

---

[10] Plaintiff's psychiatric medications included:  hydroxyzine pamoate, lamotrigine, Seroquel, and methadone.  (Tr. 745).

address whether Plaintiff would be disabled in the absence of substance abuse. The ALJ rejected the treating provider opinion because "as discussed above, the claimant's mental impairments simply do not meet the criteria of any of the mental impairment listings. Furthermore, Ms. Tellis' assertion that the claimant continues to experience severe mental health symptoms is inconsistent with the most recent La Frontera records, which document that the claimant was stable, doing well and had a grossly normal mental status examination." (Tr. 29).

While disability opinions are reserved for the Commissioner, reasons for rejecting a treating doctor's opinion on the ultimate issue of disability are comparable to those required for rejecting a treating physician's medical opinions. *Holohan v. Massanari*, 246 F.3d 1195, 1202-03 (9th Cir.2001) (citing *Reddick*, 157 F.3d at 725). "If the treating physician's opinion on the issue of disability is controverted, the ALJ must still provide 'specific and legitimate' reasons in order to reject the treating physician's opinion. *Id.*

In challenging the ALJ's finding, Plaintiff argues that La Frontera records during Plaintiff's period of sustained sobriety reflect his complaints that he continued to experience unstable moods (Tr. 664 (February 27, 2013 (adjusted medication in attempt to address unstable mood)) and impaired sleep (Tr. 670 (December 7, 2012); Tr. 664 (February 27, 2013)). There are not many records from La Frontera dating from Plaintiff's amended alleged onset date of October 3, 2012, which also coincides with laboratory results showing Plaintiff has been drug free since that time. Treatment notes during this time also reflected that Plaintiff presented as "very anxious, fidgets, rapid and forceful speech. Rocks back and forth. Feels paranoid. Thought processes are rapid, circumstantial and logical." (Tr. 672 (November 2012); *see also* Tr. 670 (on December 7, 2012, Plaintiff presented with increased speech and restricted affect)). Yet, as Plaintiff continued with abstinence from substance abuse, the treatment notes also documented good eye contact (Tr. 670 (December 7, 2012)), linear and logical thought processes (*Id.*); *see also* Tr. 664 (February 27, 2013 treatment note indicating euthymic, thought processes within normal limits, appropriate affect, and "ok" attention, thought content,

speech, insight and judgement); Tr. 662 (March 29, 2013 treatment note indicating euthymic, thought process within normal limits and "ok" thought content, speech, insight and judgement)).

There can be no argument that the La Frontera records dating from Plaintiff's period of sustained sobriety show improvement.   However, during this same time frame, Plaintiff lived in a transitional housing facility.  (Tr. 664 (February 27, 2013)).  The Ninth Circuit has emphasized that reports of improvement "must also be interpreted with an awareness that improved functioning while being treated and while limiting environmental stressors does not always mean that a claimant can function effectively in a workplace."  *Garrison*, 759 F.3d at 1017-18.  *Cf.* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(E) ("if you have chronic organic, psychotic, and affective disorders, you may commonly have your life structured in such a way as to minimize your stress and reduce your symptoms and signs.  In such a case you may be much more impaired for work than your symptoms and signs would indicate."). The treating providers state that Plaintiff's symptoms during his sobriety and his medications decrease his capacity to function in situations that require a consistent routine or schedule, prolonged interaction with others, sustained periods of wakefulness and concentration, stressful environments, or environments requiring high-level problem solving.[11]   The ALJ did not appear to take into account that the treatment records he relied upon to reject this opinion occurred during a period when Plaintiff appeared to be living in such a way as to have reduced stressors:  he was living in a transitional housing facility, he was not subjected to the demands of adhering to a regular schedule, nor is there evidence he was interacting with others aside from his fiancée and treating providers.  As such, the record as a whole does not support the ALJ's stated reasons for rejecting the treating provider assessment concerning Plaintiff's limitations.

### 4.   LAY TESTIMONY

Plaintiff also takes issue with the ALJ's rejection of a third party function report

---

[11] Many of these limitations are arguably in line with Dr. Marks' opinion.

submitted on October 29, 2012 by Plaintiff's friend, Allison Huff.  Ms. Huff indicated, in pertinent part, that Plaintiff is unable to sleep through the night, sometimes wears the same clothes for days, and "gets in a 'funk' [and] won't shower sometimes for days." (Tr. 282-83).  Although he will go with her to the grocery store, he will not shop alone. (Tr. 285).  Plaintiff has no friends and isolates himself, he is "anti-social" and trusts no one.  (Tr. 286, 287).  His conditions affect his abilities to: lift, squat, bend, kneel, talk, remember, complete tasks, concentrate, use his hands, and get along with others.  (*Id.*).

The ALJ declined to attribute "significant weight" to Ms. Huff's report because she "is not medically trained to make exacting observations…", thus resulting in questions as to the accuracy of her statements.  (Tr. 29-30).  Although the ALJ initially referred to Ms. Huff as Plaintiff's "friend" (Tr. 29), he later stated that Ms. Huff, as Plaintiff's "niece….cannot be considered a disinterested third party witness whose testimony would not tend to be colored by affection for…" Plaintiff and to agree with the symptoms and limitations he alleges.  (Tr. 30).  The ALJ also rejected Ms. Huff's testimony because it was not consistent with the preponderance of the opinions and observations by the medical doctors.  (*Id.*).

"Lay testimony as to a claimant's symptoms or how an impairment affects the claimant's ability to work is competent evidence that the ALJ must take into account." *Molina*, 674 F.3d at 1114 (citing *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir.1996); *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir.1993)).  Further, "in order to discount competent lay witness testimony, the ALJ 'must give reasons that are germane to each witness,' *Dodrill*, 12 F.3d at 919." *Molina*, 674 F.3d at 1114.  Lay witness testimony cannot be discredited due to lack of medical or vocational expertise. *See Bruce v. Astrue*, 557 F.3d 1113, 1116 (9th Cir. 2009).

Defendant concedes the ALJ's reliance on Ms. Huff's lack of medical training was improper, but argues that the remaining reasons proffered by the ALJ are valid.  (Doc. 19, p. 12  n.4).  Defendant argues that the ALJ correctly dismissed Ms. Huff's statement given that "treatment notes document grossly normal mental status examinations during

the sober period from late 2012 forward…, which are inconsistent with Ms. Huff's suggestion of disabling limitations."  (Doc. 19, p. 13 (record citations omitted)).

Near the time Ms. Huff submitted her statement, Plaintiff's treatment notes reflected he had trouble sleeping.  (Tr. 672 (November 2012); Tr. 670 (December 2012)). A November 2012 note reflected Plaintiff presented as "[v]ery anxious, fidgets, rapid and forceful speech.  Rocks back and forth.  Feels paranoid. Thought processes are rapid, circumstantial and logical."  (Tr. 672).  In December 2012, Plaintiff's speech was increased in rate and his affect was restricted, although his feelings of paranoia had resolved upon a change in medication.  (Tr. 670).  Ms. Huff's October 2012 statement appears to accurately reflect Plaintiff's situation in late 2012 with regard to his mental impairments.   Contrary to the ALJ's finding that Ms. Huff's statement was "not consistent with the preponderance of the opinions and observations by the medical doctors in this case" (Tr. 30), Dr. Marks and the treating providers at La Frontera indicated that Plaintiff's mental impairments caused limitations. While later records reflect some improvement in Plaintiff's symptoms that were described by Ms. Huff, as discussed above, the ALJ's consideration of those records failed to take into account that during this period of improvement, Plaintiff appeared to have structured his life so as to have reduced stressors.

Further, the ALJ's rejection of Ms. Huff's statement because of bias due to her relationship as his "niece" is not supported by the record given that there is no evidence that Ms. Huff is Plaintiff's niece.  To the extent that Defendant argues that Ms. Huff is, nonetheless "an interested witness who has a tendency to endorse Plaintiff's alleged symptoms and limitations[]" (Doc. 19, p. 13), at this point on this record such presumed bias would be the only reason to discount Plaintiff's testimony.  Defendant has cited no authority for the premise that an ALJ can reject lay witness testimony solely on presumed bias based on the witness's relationship to or "affection for the claimant" (Tr. 30). Instead, the case law supports the opposite conclusion.  *See e.g., Smolen v. Chater,* 80 F.3d 1273, 1289 (9th Cir. 1996); *Greger v. Barnhart*, 464 F.3d 968 (9th Cir. 2006) (ALJ

provided more than one reason to discount lay testimony).  *Cf. Valentine,* 574 F.3d at 694 (noting that lay witnesses may not be dismissed based upon the "broad rationale" that they are interested parties).

### 5.   REMAND FOR FURTHER PROCEEDINGS

Plaintiff requests that the Court "either remand the case for further consideration or find in Mr. Lohmeier's favor."  (Doc. 17, p. 15).  Defendant argues that in the event the Court finds that the ALJ erred, remand for benefits is not the appropriate remedy. (Doc. 19, pp. 13-17).

"A district court may 'revers[e] the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing,' *Treichler v. Comm'r of Soc., Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014) (citing 42 U.S.C. § 405(g)) (alteration in original), but 'the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation,' *id*. (quoting *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985))." *Dominguez,* 808 F.3d at 407.  Remand for an award of benefits is appropriate where:

> (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.[12]

*Garrison,* 759 F.3d at 1020 (footnote and citations omitted); *see also Benecke v. Barnhart,* 379 F.3d 587, 593 (9th Cir. 2004) (citations omitted).  In evaluating whether further administrative proceedings would be useful, the court "consider[s] whether the record as a whole is free from conflicts, ambiguities, or gaps, whether all factual issues have been resolved, and whether the claimant's entitlement to benefits is clear under the applicable legal rules." *Treichler,* 775 F.3d at 1103-04.

---

12 The Ninth Circuit has noted that the third factor "naturally incorporates what we have sometimes described as a distinct requirement of the credit-as-true rule, namely that there are no outstanding issues that must be resolved before a determination of disability can be made."  *Garrison,* 759 F.3d at 1020 n. 26 (citing *Smolen,* 80 F.3d at 1292).

The Ninth Circuit has made clear that it is an abuse of discretion to remand "for an award of benefits when not all factual issues have been resolved." *Garrison,* 775 F.3d at 1101, n.5 (citation omitted). Moreover, even when all three factors of the test are met, the "district retains the flexibility to 'remand for further proceedings when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act.'" *Treichler,* 775 F.3d at 1102 (quoting *Garrison,* 759 F.3d at 1021); *see also Dominguez,* 808 F.3d at 407-08 ("the district court must consider whether…the government has pointed to evidence in the record 'that the ALJ overlooked' and explained 'how that evidence casts into serious doubt' the claimant's claim to be disabled.") (quoting *Burrell,* 775 F.3d at 1141).

Plaintiff has presented no argument to support a finding that the matter should be remanded for an immediate award of benefits rather than for further proceedings. Instead, Plaintiff recognizes, "[t]he proper course, except in rare cases, is to remand for additional explanation [sic] investigation." (Doc. 20, p. 3 (citing *Treichler,* 775 F.3d 1090)). Defendant contends that remand for further proceedings is appropriate because Dr. Marks' "evaluation was inconsistent with [Plaintiff's] presentation during other contemporaneous provider visits[]" and that Dr. Marks' assessed limitations are internally inconsistent. (Doc. 19, pp. 15-16). That Plaintiff had good eye contact with a treating provider, whom he had seen more than once, but avoided eye contact with Dr. Marks when they met presumably for the first and only time does not undermine Dr. Marks' observation that Plaintiff avoided eye contact. Further, the note by examining internal physician Dr. Suarez under "physical examination…general" that Plaintiff had "adequate recall" (*see* Tr. 647) (all capitalization omitted), does little to undermine Psychologist Marks' findings about Plaintiff's recall upon administering the Mini Mental Status examination and his clinical assessment of Plaintiff's mental functioning. This is not a situation where Dr. Suarez was treating Plaintiff's mental impairments or specifically assessing signs associated with same. *Cf. Sprague v. Bowen,* 812 F.2d 1226, 1231-32 (9th Cir. 1987) (accepting treating physician's opinion of plaintiff's mental state

where he prescribed medication for plaintiff's psychiatric condition).  Furthermore, there is no explicit showing of inconsistencies in Dr. Marks' assessed limitations at issue, which addressed different topics. He found that, with regard to the topic of "sustained concentration and persistence"[13], Plaintiff could "likely work for short periods of time[]" with frequent breaks.  With regard to the topic of "social action"[14], Dr. Marks made no express finding that Plaintiff could likely work for extended periods.  He indicated that *if* Plaintiff were capable of working for an extended period, he would need to be able to work at his own pace without interacting on a continual basis with others. (TR. 644) (all capitalization omitted).  Nonetheless, questions remain regarding Dr. Marks' assessed limitations.   For example, there is no indication what Dr. Marks meant by a "short period[]" or the how frequent breaks should be. (Tr. 644).  Nor was the VE questioned about the limitations assessed by Dr. Marks.  (*See* Tr. 59-60).

Additionally, as discussed above with regard to the treating provider assessment and Ms. Huff's statement, the ALJ should consider whether Plaintiff is more impaired than his symptoms and signs reflected in the La Frontera treatment notes during his period of sustained sobriety would indicate in light of the fact that Plaintiff appears to have structured his life in such a way as to reduce his exposure to stressors and, thus, reduce his symptoms. *See e.g. Garrison,* 759 F.3d at 1017-18.  The ALJ's consideration of this issue may also require taking additional evidence and further questioning of the VE.

In light of the ambiguities in the record, as well as the likely need for further testimony from a VE, remand for further proceedings is appropriate in this case.  *See Garrison,* 775 F.3d at 1101, n.5 (citation omitted).  The Court is not unsympathetic to the fact that remand for further proceedings prolongs an ultimate resolution, however, the

---

[13] Sustained concentration and pace involves "the ability to carry out simple instructions, maintain attention and concentration, and maintain regular attendance".  (Tr. 644).

[14] Social interaction involves "the ability to get along with co-workers, respond appropriately to supervision, maintain socially appropriate behavior, and adhere to basic standards of neatness".  (Tr. 644).

instant record supports no other outcome. As, the Ninth Circuit has stated: "While we have recognized the impact that delays in the award of benefits may have on claimants, such costs are a byproduct of the agency process, and do not 'obscure the more general rule that the decision of whether to remand for further proceedings turns upon the likely utility of such proceedings.'" *Treichler,* 775 F.3d at 1103 (quoting *Harman v. Apfel,* 211 F.3d 1172, 1179 (9th Cir. 2000)).

**V.   CONCLUSION**

For the foregoing reasons, this matter is remanded to the Commissioner for further proceedings  consistent with this Order.

Accordingly,

IT IS ORDERED that:

(1)      the Commissioner's decision denying benefits is REVERSED; and

(2)      this action is REMANDED to the Commissioner for further proceedings consistent with this Order.

The Clerk of Court is DIRECTED to enter Judgment accordingly and to close its file in this matter.

Dated this 2nd day of March, 2016.

_____
Bernardo P. Velasco
United States Magistrate Judge